# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 03-3170

ARTHUR P. BAIRD, II,

*Petitioner-Appellant*,

v.

CECIL DAVIS, Superintendent,

*Respondent-Appellee.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 98 C 70—**Larry J. McKinney**, *Chief Judge.*

_____

ARGUED JUNE 16, 2004—DECIDED NOVEMBER 12, 2004
_____

Before POSNER, RIPPLE, and WOOD, *Circuit Judges.*

POSNER, *Circuit Judge.* Arthur Baird was convicted by a
jury in an Indiana state court of murder and was sentenced
to death by the judge on the jury's recommendation. After
exhausting his state judicial remedies in *Baird v. State*, 604
N.E.2d 1170 (Ind. 1992); *id.*, 688 N.E.2d 911 (Ind. 1997), Baird
sought federal habeas corpus. The district court denied him
relief, and he appeals. His only challenge is to the sentence,
and specifically to what he contends was the failure of the
Indiana Supreme Court, in affirming the sentence, to give
proper consideration to his mental state as a mitigating

factor. He does devote a portion of his brief to contending that his confession should not have been admitted into evidence. But at argument his lawyer conceded that, since there is no challenge to the conviction and no suggestion that the confession played a role in the sentence, the objection to the admission of the confession is academic. Baird also does not challenge the Indiana courts' decision to deny him postconviction relief.

When he committed the murders in 1985, Baird was a man in his late 30s with an exemplary record as a law-abiding citizen, church deacon, and Navy veteran. He lived with his wife Nadine, who was six months pregnant, on a farm that he owned jointly with his parents. At about 5 o'clock one afternoon, he strangled her. Later, in a phone conversation with Nadine's mother, Baird told her that he and Nadine wouldn't be visiting her parents that evening because she was sick. Baird spent the night watching television, writing notes, and periodically lying down next to Nadine's body and holding it. The next morning he went to his parents' house on the farm at about 7 a.m. He fed the chickens, brought the newspaper to his father, and received a haircut from his mother. When his mother had finished cutting his hair and returned to the kitchen sink to continue making pickles, Baird picked up a butcher knife and stabbed her to death. He then went to the back door, where his father was just entering the house, told his father that there had been a disturbance, and then stabbed him to death with the butcher knife.

Baird returned to his own house and wrote another series of notes, some expressing remorse (e.g., "I am sick at heart for having done such a terrible act. . . . The police do not have to come after me. I will turn myself in") and others containing instructions for feeding the chickens—and burying them after the food ran out if no one wanted to butcher

them for his or her own use—and for completing the pickl-
ing that his mother had left unfinished when he killed her.
He loaded up his parents' car with food, newspapers, paper
towels, and other items. At some point his mother-in-law
called to inquire how her daughter was and he told her that
Nadine was still in bed but that the two of them were going
to leave soon for their real estate agent's office to close a
deal on a 253-acre farm that he had an option to buy. He
had thought that the government was going to give him a
million dollars in exchange for his ideas about how to solve
the nation's economic problems. This was a complete
delusion, in conformity with which he had announced, in the
bulletin of his church and elsewhere, that he was going to
buy the farm for $575,000. He had boxed most of his
possessions in preparation for the move and had scheduled
the closing in the real estate agent's office, at which he was
to make a down payment on the farm with a $50,000
certified check. In fact he had many debts and no money,
having been recently laid off from his modest-paying
factory job. As the date of the closing drew near, Baird was
observed by neighbors to have become nervous and with-
drawn.

Having loaded the car he drove to a different town, where
the next day the police (who had found the bodies and the
notes) arrested him as he was watching a softball game. The
previous evening (the evening of the day on which he had
murdered his parents) he had been observed sitting in the
car in the parking lot of a bar, reading a book by the dome
light. The owner had been concerned about this odd
behavior and called the police, who questioned Baird but
didn't arrest him.

There is no indication that Baird had any financial motive
in committing the murders, or that he had hostile or even
strained relations with either his wife or his parents. Despite

the bizarre circumstances of the murders, two psychiatrists testified that he was sane, at least when he murdered his parents. Two other psychiatrists, plus a clinical psychologist, while agreeing that Baird knew the difference between right and wrong when he committed the murders, thought that he suffered from an obsessive-compulsive disorder that had prevented him from conforming his behavior to his moral perception. Baird himself described the murders to the psychiatrists as motiveless and ascribed them to the pressure of the impending purchase of the farm; he thought the pressure had caused him to crack. He told them that he had resisted the compulsion to kill but had been unable to overcome it. The jury found him guilty of first-degree murder (and feticide) without qualification, refusing to find him either not responsible by reason of insanity or guilty but mentally ill. The correctness of this judgment is not in issue.

During the penalty phase of the case, the jury recommended that Baird be sentenced to death for the murder of his parents but not for the murder of his wife (and fetus). As required by Indiana law, the trial judge made an independent determination of whether to impose the death sentence, but came to the same conclusion as the jury. (Indiana's death-penalty statute has since been amended, in light of *Ring v. Arizona*, 536 U.S. 584 (2002), to make the jury's decision definitive. Ind. Code § 35-50-2-9(e) (1998), amended by 2002 Ind. Acts 117, § 2; *Ritchie v. State*, 809 N.E.2d 258, 263-64 and n. 1 (Ind. 2004). But this change has no bearing on the present case, given the concordance of judge and jury.) The judge didn't think Baird's mental condition should be given any weight in mitigation of the heinousness of the murder of his parents. The Indiana Supreme Court disagreed and conducted its own, independent analysis of the mitigating and aggravating circumstances and concluded that the death sentence was proper. The court did not doubt that Baird had known the difference between right and

wrong and had known when he committed the murders
that he was doing wrong, but the court acknowledged that
he had been acting under the influence of a serious mental
disorder (604 N.E.2d at 1182):

> The [sentencing] judge also declared in his findings
> that the several mitigating circumstances he found to
> exist were outweighed by the single aggravating circum-
> stance. The court considered all categories of mitigating
> factors, finding that appellant had no history of prior
> criminal conduct, was of a law abiding nature, was an
> active participant in his church, held employment and
> provided for his family as best he could, served his coun-
> try in military service and was honorably discharged,
> and was generally held to be a person of good character
> in his community. With respect to the murder of Nadine
> Baird, the court also found that appellant may have been
> under the influence of extreme mental or emotional dis-
> turbance at the time of the murder, and that this same
> mental condition may have substantially impaired
> appellant's capacity to conform his conduct to the
> requirements of the law.
>
> The court specifically found that there were no miti-
> gating circumstances springing from appellant's mental
> condition at the time of the murder of his parents. After
> review of the record including the psychiatric testimony,
> however, we are inclined to find that appellant's mental
> condition at the time of the murders of his parents is en-
> titled to some mitigating value. The psychiatric evi-
> dence supports a determination that appellant has an
> obsessive-compulsive disorder. The testimony was un-
> contradicted that appellant sincerely believed that the
> federal government was going to give him one million
> dollars for his ideas on how to solve the country's
> economic problems, and that he and Nadine would use

the money to purchase and equip a 253 acre farm. There was no basis in experience for this belief. At this time appellant had no income, was in debt, and Nadine was pregnant. Appellant was so obsessed with the idea of buying this farm that he set a closing date at which time he was to tender a $50,000 certified check, and as he finally realized that his grandiose plans would be exposed as a mere fantasy to the persons whose derision would be most destructive to him he was compelled to protect himself from them. We find that appellant was under the influence of extreme mental or emotional disturbance when the murders were committed, but find this mitigating factor to be in the low range. We also find that the mitigating circumstances of appellant's regular employment, church participation, military service, law abiding nature, and good character in the community each to be in the low range. Appellant's lack of prior criminal history is a mitigating factor in the medium range. Upon review, we find that these mitigating circumstances as we have determined and evaluated them are outweighed by the sole aggravating circumstance, namely, the murders of Kathryn and Arthur Paul Baird, I, having already committed the murder of Nadine Baird, an aggravating circumstance in the highest range. Appellant's sentence is not arbitrary or capricious and is not manifestly unreasonable.

The principal arguments that Baird's lawyer makes against the constitutionality of the sentence are ones addressed to the wrong court. The first (made only at the oral argument in this court, which was too late) is that it is cruel and unusual punishment to put to death a person who murders under an irresistible impulse. The second is that the Indiana courts should have found that the principal mitigating circumstance of Baird's crimes, namely his mental disorder, outweighed the aggravating circumstance, namely the

additional murders. These arguments have yet to prevail in the U.S. Supreme Court, and are therefore beyond our authority to accept in this habeas corpus appeal. The Court has ruled out the death penalty for the retarded and for minors under the age of 16. *Atkins v. Virginia*, 536 U.S. 304 (2002); *Stanford v. Kentucky*, 492 U.S. 361, 380 (1989) (plurality); *id.* at 381-82 (concurring opinion); *Thompson v. Oklahoma*, 487 U.S. 815, 838 (1988) (plurality). But it has not yet ruled out the execution of persons who kill under an irresistible impulse. And it has made clear that a sentencing court in balancing aggravating and mitigating circumstances bearing on the imposition of the death penalty is not required to give any fixed weight to any particular mitigating circumstance. *Harris v. Alabama*, 513 U.S. 504, 512 (1995); *Eddings v. Oklahoma*, 455 U.S. 104, 112-115 (1982); cf. *Wallace v. Davis*, 362 F.3d 914, 916-19 (7th Cir. 2004). Ordinarily of course a litigant can ask a lower federal court for an innovative constitutional interpretation, such as a new immunity from the death penalty. But that path is closed when the case before the court is an application for habeas corpus relief. 28 U.S.C. § 2254(d)(1); *Yarborough v. Alvarado*, 124 S. Ct. 2140, 2147-50 (2004); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

Baird's lawyer also argues, however, that the analysis of mitigation by the Indiana Supreme Court in the passage that we quoted is fatally inadequate, and this is an argument that is within the remit of a federal court asked in a habeas corpus case to set aside a state court's death sentence. State courts may not refuse to consider mitigating circumstances in capital cases. *Hitchcock v. Dugger*, 481 U.S. 393, 398-99 (1987); *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986); *Eddings v. Oklahoma*, *supra*, 455 U.S. at 110, quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality) ("any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence

less than death"). Baird contends that the Indiana Supreme Court committed both a legal oversight and a factual error in its discussion of the bearing of his mental illness on the propriety of the sentence. We must evaluate this contention with due regard for the fact that under the current regime of federal habeas corpus we can set aside a state court's criminal judgment only if (so far as is pertinent to this case) the state court's application of federal law as declared by the U.S. Supreme Court is "unreasonable"—and "an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S 685, 694 (2002).

The claimed legal oversight committed by the Indiana Supreme Court arises from the fact that the Indiana death-penalty statute lists two mitigating factors to which mental illness can be relevant, and Baird contends that the Indiana court failed to consider one of them. The one that he concedes the court considered is that "the defendant was under the influence of extreme mental or emotional disturbance when the murder was committed." Ind. Code § 35-50-2-9(c)(2). The long passage we quoted from the court's opinion conforms to the language of this provision in stating that Baird "was under the influence of extreme mental or emotional disturbance when the murders were committed." The other mitigating factor, the one Baird claims the court overlooked, is that "the defendant's capacity to appreciate the criminality of the defendant's conduct or to conform that conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication." § 35-50-2-9(c)(6). The court discussed at length Baird's capacity to appreciate the criminality of his conduct, and that capacity, as we said, is not at issue. The contention is that the court overlooked the other part of subsection (c)(6)—that "the defendant's capacity . . . to conform that conduct to the requirements of law was substantially impaired as a result of mental disease. . . ."

This ground for reversal was proposed at the oral argument in this court, but not in either of Baird's briefs. The opening brief quoted subsection (c)(6) as well as (c)(2), and said that "the evidence presented at Baird's trial and at his sentencing hearing clearly established the existence of both statutory mitigators." But the brief did not suggest that the Indiana court had failed to consider any part of (c)(6). It argued that the Indiana Supreme Court had assigned too little weight to Baird's mental condition as a mitigating circumstance, but it did not say or imply that the court had *disregarded* (c)(6) evidence.

Ordinarily it is too late to present a ground for reversal for the first time at the oral argument. But we would be reluctant in a capital case to declare a ground forfeited merely because the defendant had failed to present it in his briefs in this court. For we could easily order the submission of supplemental briefs on the question, to give the state an opportunity to rebut, and then the state would not have been prejudiced by the oversight. But the (c)(6) ground was not presented in the district court either. There Baird argued, much as in this court, that "in reaching its conclusion that [his] mental condition was a mitigating factor in the 'low range' the Indiana Supreme Court did not accurately review or adequately consider the evidence below," and he urged that the case be returned to that court so that the court might "re-weigh the aggravating and mitigating factors." He said that "evidence as to his mental condition at the time of the murders supported the existence of a mitigating circumstance under I.C. 35-50-2-9(c)(2) and (c)(6)," but in so saying he was criticizing just the *sentencing judge's*—not the Indiana Supreme Court's—refusal to deem Baird's mental disorder a mitigating circumstance. He acknowledged that the Indiana Supreme Court had held that "the trial court *erred* in finding that Baird's mental condition was entitled to no weight" (emphasis added). He argued that the Indiana Supreme

Court should have given it more weight, but not that it had given it no weight or that it had ignored (c)(6). And likewise in his reply to the state's response to the district court's order to show cause he argued only that if the court "correctly interpreted" the mental health evidence it would appreciate Baird's volitional impairments more fully and thus deem his mental condition to be in the high range of mitigating factors rather than in the low range.

What is much more serious than the oversights in Baird's submissions to the district court and to this court—what creates, indeed, an insuperable obstacle to our accepting the argument—is Baird's failure to argue to the Indiana Supreme Court that (c)(6) had been overlooked. Baird appealed to that court twice, first from his conviction and sentence and second from the denial of his application for state postconviction relief. On neither appeal did he argue that (c)(6), so far as it might bear on this case, is different from (c)(2). His briefs in his first, the direct, appeal treated (c)(2) and (c)(6) as completely interchangeable in their application to this case, so it is no surprise that the Indiana Supreme Court in upholding his sentence did not discuss them separately. His briefs in his second, the postconviction, appeal likewise did not complain about the court's failure, in deciding on his first appeal that the mitigating circumstances of the murders were outweighed by the aggravating circumstances, to discuss the two subsections separately. In fact, the briefs in the second appeal did not cite either subsection. The opening brief did say that "the fact that the evidence strongly suggests Baird's inability to conform his actions to the law as a result of a mental disease or defect is a mitigating circumstance and one which is entitled to substantial weight." But it is apparent from the surrounding discussion that the argument is not that the Indiana Supreme Court had overlooked this mitigating circumstance (nowhere, to repeat, does the brief distinguish between (c)(2) and (c)(6)) but that the court should

have given it more weight than it gave the aggravating circumstance. Similarly, when he said that "it is unreasonable to ascribe *less than 'substantial' weight* to the mitigating circumstance of his mental health" (emphasis added), he was complaining not that his (c)(6) evidence had been given no weight but that it had been given too little weight.

Even in a capital case we cannot grant habeas corpus relief on a ground that the state's highest court was not asked to consider. 28 U.S.C. §§ 2254(b)(1)(A), (c); *Strickler v. Greene*, 527 U.S. 263 (1999); *Breard v. Greene*, 523 U.S. 371, 375 (1998) (per curiam); *Mahaffey v. Schomig*, 294 F.3d 907, 914-19 (7th Cir. 2002); *Elizalde v. Dretke*, 362 F.3d 323, 328-31 (5th Cir. 2004). The ground appears, moreover, to have no merit, which may be why it has been urged only as an afterthought and which in any event provides an alternative ground for our decision.

The Indiana Supreme Court had in previous cases regularly treated "under the influence of extreme mental or emotional disturbance" ((c)(2)) and "capacity . . . to conform [his] conduct to the requirements of law was substantially impaired as a result of mental disease" ((c)(6)) interchangeably. See *Bivins v. State*, 642 N.E.2d 928, 947 (Ind. 1994); *Benirschke v. State*, 577 N.E.2d 576, 581-82 (Ind. 1991); *Brown v. State*, 577 N.E.2d 221, 234 (Ind. 1991); *Lowery v. State*, 547 N.E.2d 1046, 1059 (Ind. 1989). This is not surprising (nor is it surprising that Baird should have done the same thing right up until the oral argument of his appeal in this court) when we consider the wording of the two subsections. Their coverage is not identical, because (c)(6) adds inability to appreciate the criminality of the act to inability to conform to the requirements of law, and adds mental defect and intoxication to mental disease, as possible mitigating circumstances, while (c)(2) adds severe emotional disturbance to mental disease. But in a case such as this in which there is

no suggestion of a mental defect, or intoxication, or a severe emotional disturbance that is *not* produced by a mental disease (Baird's emotional disturbance was produced by a mental disease that the Indiana supreme court identified as "an obsessive-compulsive disorder," of which more shortly), or an inability to understand the criminality of the act, the subsections coincide. If there is a practical difference in such a case, no Indiana court has identified it, and there is no relevant legislative history to suggest that there is any difference. It is not unusual for two statutes to overlap; this case happens to fall in the area of overlap.

In discussing mitigating circumstances in this case, moreover, the Indiana Supreme Court, though like Baird's lawyers it did not refer to the (c)(2) or (c)(6) factors by section number, in fact addressed both of them. For in the last sentence of the court's first paragraph (in the passage we quoted earlier) we read that "with respect to the murder of Nadine Baird, the [trial] court also found that appellant may have been *under the influence of extreme mental or emotional disturbance* at the time of the murder, *and that this same mental condition may have substantially impaired appellant's capacity to conform* his conduct to the requirements of the law" (emphasis added). This is a paraphrase of *both* subsections. So when in the next paragraph, in which the Indiana Supreme Court presents its own evaluation of the significance of Baird's mental condition as a mitigating factor, the court states that it is "inclined to find that appellant's mental condition at the time of the murders of his parents is entitled to some mitigating value," the implication is that the court is going to consider the *same* concept of mitigation, embracing *both* statutory factors, as the trial judge, and with respect to all the murders, not just Nadine's. It would be unreasonable to impute to the court the weird idea that Baird's mental condition triggered both (c)(2) and (c)(6) with respect to her murder but only (c)(2) with respect to the murder of his

parents. Nowhere does the court suggest that Baird's mental disorder might have changed between the murder of Nadine and the murder of Baird's parents. That would be inconsistent with the court's depiction of Baird's mental condition in terms of symptoms that had manifested themselves before any of the murders had been committed.

That the court in this critical paragraph was indeed cognizant of both subsections of the mitigation statute becomes clearer still when the court remarks that "appellant has an obsessive-compulsive disorder" and "was compelled to protect himself from them [his parents and wife, when they discovered that his grandiose plans were a fantasy]." The reference to "compulsive" and "compelled" behavior implies that Baird's mental disorder "substantially impaired" his capacity to refrain from murdering his parents. The psychiatric literature describes the "Grandiose Type" of "Delusional Disorder," in which "the central theme of the delusion is the conviction of having some great (but unrecognized) talent or insight or having made some important discovery." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 297 (4th ed. 1994); see also *id.* at 421.

The alleged factual error that is Baird's remaining challenge to the sentence is found in the following statement in the Indiana Supreme Court's opinion (also in the quoted passage): "Appellant was so obsessed with the idea of buying this farm that he set a closing date at which time he was to tender a $50,000 certified check, and as he finally realized that his grandiose plans would be exposed as a mere fantasy to the persons whose derision would be most destructive to him he was compelled to protect himself from them." Baird argues that there is absolutely no evidence that he killed his wife and parents because the exposure of his delusion for what it was would bring their derision upon him. But there

was evidence of this. One of the psychiatrists asked Baird whether he thought it would be a rational theory of the motivation for his seemingly motiveless killing of his wife that he feared exposure of his fantasy about buying the $575,000 farm. Baird answered that it would be a rational theory, but that it was not his actual motive. The fact that the hypothesis was proposed was, however, some evidence that it was a plausible explanation for an otherwise inexplicable spate of killings. And while Baird denied that the hypothesis was correct, his only explanation of his actions—that anxiety about the farm deal made him snap—was consistent with it. Another psychiatrist, moreover, thought the hypothesis an "excellent" one; "it fits very well."

This was admissible testimony. If a hypothesis is propounded to a witness and he accepts it, it is no longer hypothetical; it is evidence. But the strength of the evidence hardly matters, since the court did not use it to undermine Baird's claim to have been acting under the influence of a mental disorder. It is not as if the court had believed that the "hypothesis" indicated that Baird had been lucid when he committed the murders, or as if the court had bought into the trial judge's conclusion that the murders had been "done in a fairly cold and calculating sort of way." The court rejected a lucidity theory of Baird's actions, as is apparent from its references to his obsessive-compulsive disorder, his delusions and obsessions, and the fact that his behavior was "compelled," that is, committed "under the influence of extreme mental or emotional disturbance."

Insane people do not act without cognition. Their problem is that their cognition is profoundly distorted. To "reason" that one must "protect" oneself from exposure of one's fantasies by murdering the people one loves is insane—as the Indiana Supreme Court recognized. The "grandiose plans" passage appears in the Indiana Supreme

Court's opinion as evidence not that Baird was sane but that he was acting under compulsion.

Baird himself accepted a variant of the "grandiose plans" hypothesis in the opening brief in his direct appeal to the Indiana Supreme Court. On pages 149-150 of that 244-page brief (prepared by counsel), we read, after the trial court is quoted as having found "that the murders were triggered by [Baird's] deep seated sense of concern about being found out to be living in a fantasy world," that

> since Art [Baird] was living in fantasy world, as the court found he was, and if Art was willing to kill the parents that he deeply loved to keep that fantasy from being exposed, then there is absolutely no need to resort to the opinions of any mental health experts because the kind of thinking which the trial court claims Art engaged in can be recognized by anyone as being clearly crazy, insane, mentally disturbed and totally irrational thinking. A person who is not under the influence of an extreme mental or emotional disturbance or whose capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law is not substantially impaired as a result of mental disease or defect simply does not kill his parents to protect his fantasy world from being exposed.

That is similar to what the Indiana Supreme Court said in the passage that Baird now challenges. Like Baird's lawyer, the court was trying to explain how Baird's mental disorder had played a causal role in the murders, rather than suggesting a "rational" motive for his actions or treating fear of exposure as an aggravating circumstance. The opinion is emphatic that there was only one aggravating circumstance, and that was the number of murders.

The court noted that the trial judge had "specifically found that there were no mitigating circumstances springing from appellant's mental condition at the time of the murder of his parents." The judge had thought that while Baird might have killed his wife under the influence of a severe mental or emotional disturbance, the fact that he had more than 12 hours to calm down, as it were, yet still killed his parents, made it implausible that when he killed them he was in a disturbed mental state. The Indiana Supreme Court disagreed. But given the trial judge's doubts, the jury's refusal to qualify Baird's guilt by reference to his mental condition ("guilty but mentally ill" was, as we noted, one of the options the jury could have selected, but did not), and the conflicting psychiatric evidence, which suggested that the nature of Baird's mental condition could not be pinned down precisely (it combined delusional with obsessive features), the court was unwilling to weight his mental disorder heavily enough to outweigh the gravity of Baird's crime in the calculus of punishment.

No doubt had Baird been sane he would not have killed his wife and parents, if only because he would not have believed that the government was going to pay him a million dollars for his ideas about how to solve the nation's problems; the delusion seems somehow to have precipitated these rationally motiveless crimes. But he knew he was committing murders and knew it was wrong to do so, and no one can assign a precise weight to the delusion, or the obsessive-compulsive disorder to which the delusion was in some way related, in the mental process that led to his killing his parents. Clearly, his volition, his self-control, was impaired by a mental disease—but how much, in relation to other unknown factors at work in his mind during the period in which the murders occurred, we shall never know.

Judgment in a case such as this is committed to the discretion of the state courts. It is for them, not us, to determine in each individual case what weight to give mental disease that does not obliterate consciousness of wrongdoing in deciding whether to impose the death penalty for murder. *Harris v. Alabama, supra*, 513 U.S. at 512; *Eddings v. Oklahoma, supra*, 455 U.S. at 113-15; *Simmons v. Bowersox*, 235 F.3d 1124, 1137 (8th Cir. 2001); *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *Ceja v. Stewart*, 97 F.3d 1246, 1251 (9th Cir. 1996); *Raulerson v. Wainwright*, 732 F.2d 803, 806-07 (11th Cir. 1984). As an original matter we might think it inappropriate to sentence to death a man as seemingly insane as Baird at the time of the murders. But it is not our judgment to make and we cannot say that the exercise of judgment by the Indiana courts was vitiated by legal or factual errors that are within our authority to correct. The judgment dismissing the application for habeas corpus is therefore

AFFIRMED.

RIPPLE, *Circuit Judge*, dissenting. It is well-established that imposition of the death penalty requires an individualized determination "based on the facts and circumstances of the defendant, his background, and his crime." *Clemons v. Mississippi*, 494 U.S. 738, 748 (1990) (citing *Spaziano v. Florida*, 468 U.S. 447, 460 (1984); *Zant v. Stephens*, 462 U.S. 862, 879 (1983); *Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982); *Lockett v. Ohio*, 438 U.S. 586, 601-05 (1978) (plurality opinion); *Gregg v. Georgia*, 428 U.S. 153, 197 (1976) (joint opinion of Stewart, Powell and Stevens, JJ.)). In *Clemons*, the

Supreme Court approved the practice of "careful appellate weighing" of aggravating and mitigating evidence in light of error at the trial court level in making the individualized determination. *See id.*

In this case, the district court granted a certificate of appealability on the issue of "Baird's claim that the Supreme Court of Indiana failed to independently and adequately weigh the relevant mitigating evidence. This relates to the Indiana Supreme Court's decision both to re-weigh the mitigators and the manner in which it did so." R.59, ¶ 1. On appeal, Mr. Baird did not challenge the Supreme Court of Indiana's *decision* to re-weigh the mitigating and aggravating factors, and it is not necessary to address that issue. We are confronted with the question, however, of whether the *manner* in which the Supreme Court of Indiana conducted its reweighing involved an unreasonable application of *Clemons*. Because that reweighing both excludes relevant mitigating evidence as to Mr. Baird's volitional control and is based upon an unreasonable factual determination as to Mr. Baird's delusional state, I am unable to conclude that the appellate reweighing involves a reasonable application of *Clemons*.

I first turn to the issue of whether the state court excluded relevant mitigating evidence. In *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), Chief Justice Burger, writing for the plurality, noted that "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." In *Eddings v. Oklahoma*, 455 U.S. 104 (1982), the Supreme Court applied and elaborated upon the rule of *Lockett*. In *Eddings*, the trial court had indicated that "in following the law" it could not consider mitigating evidence of the defendant's family background. *Id.* at 112-13 (internal

citations omitted). Similarly, the state appellate court had indicated that the mitigating evidence was irrelevant because it "did not tend to provide a legal excuse from criminal responsibility." *Id.* at 113. The Court held in response: "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Id.* at 113-14. The Court further made clear that, in making the individualized determination regarding imposition of the death penalty, the sentencer "may determine the weight to be given relevant mitigating evidence." *Eddings*, 455 U.S. at 115. However, the sentencer and reviewing court "may not give [relevant mitigating evidence] no weight by excluding such evidence from their consideration." *Id.*

Relevant mitigating evidence is "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604. In its death penalty statute, Indiana specifies several statutory mitigating factors, two of which are relevant here:

> (2) The defendant was under the influence of extreme mental or emotional disturbance when the murder was committed.
>
> . . . .
>
> (6) The defendant's capacity to appreciate the criminality of the defendant's conduct or to conform that conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication.

Ind. Code § 35-50-2-9(c)(2), (6).

In this case, it appears that the Supreme Court of Indiana excluded relevant mitigating evidence from consideration. After determining that the trial court improperly failed to

give mitigating weight to Mr. Baird's mental condition, the Supreme Court of Indiana engaged in an appellate reweighing of the aggravating and mitigating factors. *See id.* In this reweighing, the court considered only that the "appellant was under the influence of extreme mental or emotional disturbance when the murders were committed," *Baird v. Indiana*, 604 N.E.2d 1170, 1182 (Ind. 1992); it gave no consideration to the substantial evidence that Mr. Baird lacked volitional control, *see id.* This omission occurred even though the appellate court's discussion immediately followed a reference to the trial court's finding in connection with Nadine's murder "that appellant may have been under the influence of extreme mental or emotional disturbance at the time of the murder, *and that this same mental condition may have substantially impaired appellant's capacity to conform his conduct to the requirements of the law." Id.* (emphasis added).

It is beyond dispute that the record contains evidence of Mr. Baird's inability to conform his conduct to the requirements of law at the time of his parents' murders. Four of the five experts who presented psychiatric testimony in the state court determined that Mr. Baird lacked or may have lacked the ability to control his actions as a result of his mental condition. Furthermore, Mr. Baird clearly argued to the Supreme Court of Indiana on direct appeal that the trial court's death sentence was inappropriate because the trial court improperly failed to give mitigating weight to evidence supporting the existence of both Indiana Code § 35-50-2-9(c)(2) and (c)(6) statutory mitigating factors.[1]

---

[1]    *See, e.g.,* R.26, Ex.B at 142 ("In the written Findings and the Judgment, the trial court made many findings of fact to attempt to support its conclusion that neither the (c)(2) or the (c)(6) mitigators existed and did not have to be weighed in deciding whether to impose the Death Sentence for the murders of Art's
(continued...)

Nonetheless, the Supreme Court characterized the mitigating evidence in terms of only § 35-50-2-9(c)(2): "We find that appellant was under the influence of extreme mental or emotional disturbance when the murders were committed." *Baird*, 604 N.E.2d at 1182. There is no basis upon which to conclude that the court considered the mitigating weight springing from evidence that Mr. Baird's "capacity . . . to conform [his] conduct to the requirements of law was substantially impaired as a result of mental disease or defect." Ind. Code § 35-50-2-9(c)(6). Under *Eddings*, the court had a constitutional obligation to consider that evidence. *See Wright v. Walls*, 288 F.3d 937, 942-45 (7th Cir. 2002) (rejecting as unreasonable Illinois Supreme Court's determination that the sentencing judge considered mitigating evidence of the petitioner's traumatic history when sentencing court used language of exclusion in rejecting that evidence); *cf. Todd v. Schomig*, 283 F.3d 842, 855 (7th Cir. 2002) (accepting as reasonable Illinois Supreme Court's determination that the sentencing court considered nonstatutory mitigating factors when sentencing court stated that " 'those other

---

[1] (...continued) parents. The trial court's Findings of Fact are not only factually incorrect, but more importantly they demonstrate that the trial court arbitrarily and capriciously gave absolutely no weight to relevant mitigating circumstances which it acknowledged existed."); *id.* at 150 ("The trial court further refused to give any weight to uncontradicted evidence from all of the mental health experts who testified that Art suffered from substantial mental impairment at the time of the murders."); *id.* at 159 (questioning whether death sentence should be imposed "where the defendant's acts were clearly the result of mental and emotional problems which were out of the defendant's ability to voluntarily control").

nonstatutory factors do have [sic] a bearing on the Courts [sic] ability to weigh the issues I raised previously' ").

Moreover, relevant mitigating evidence that Mr. Baird lacked volitional control could not be subsumed, and thereby disregarded, under the mere finding that Mr. Baird was under the influence of extreme mental or emotional disturbance. It is true that both Indiana Code § 35-50-2-9(c)(2) and (c)(6) statutory mitigating factors share a mental health component. However, the two factors reflect distinct inquiries into the circumstances surrounding the defendant. Substantial impairment of one's capacity to conform conduct to the requirements of law as a result of mental disease or defect is qualitatively different from the mere status of being "under the influence" of extreme mental or emotional disturbance.[2]

Under Supreme Court precedent, balancing of individual mitigating and aggravating circumstances is left to the sentencer. *See Eddings*, 455 U.S. at 114. Thus, the Supreme Court of Indiana constitutionally could have assigned low weight to mitigating evidence of Mr. Baird's impaired capacity to conform his conduct to the requirements of law. Constitutionally, it could not, however, as it apparently did, exclude

---

[2] Indeed, prior to a 1984 amendment, the Indiana Insanity Defense statute provided a defense to individuals who were unable to conform their conduct to the requirements of law by reason of mental disease or defect:

> *A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he lacked substantial capacity* either to appreciate the wrongfulness of the conduct or *to conform his conduct to the requirements of law.*

Ind. Code § 35-41-3-6, Pub. L. No. 340, § 11 (1977) (amended 1984) (emphasis added). The murders occurred in 1985, one year after the amendment eliminating the "irresistible impulse" defense.

that relevant mitigating evidence from its consideration in the appellate reweighing.[3]

---

[3] A question of waiver on this issue has been raised on the ground that Mr. Baird presented the argument for the first time at oral argument. Waiver is not appropriate here.

Before the district court, counsel for Mr. Baird argued in the Petition for Writ of Habeas Corpus that "Baird's evidence as to his mental condition at the time of the murders supported the existence of a mitigating circumstance under I.C. 35-50-2-9(c)(2) and (c)(6)." R.16 at 31. Further, in "Petitioner's Reply to Respondent's Return to Order To Show Cause," counsel for Mr. Baird argued:

> Had the Indiana Supreme Court in Baird's case correctly interpreted the testimony of the mental health experts, it would have concluded that Baird's behavior at the time he killed his parents was volitionally impaired to the extent that he could not control it, a fact constituting mitigation in the high range . . . .

R.33 at 10. In the opening brief to this court, counsel continued to argue that the evidence presented at trial supported the existence of both the (c)(2) and (c)(6) statutory mitigating factors, citing and quoting both factors. *See* Petitioner's Br. at 19-20. Counsel then argued that when an appellate court reweighs, it must "identify all of the relevant mitigating factors and then assign appropriate weight to each." *Id.* at 24 (emphasis added). Counsel concluded the argument by contending that the Supreme Court of Indiana made a clearly erroneous factual finding that Mr. Baird acted volitionally, which caused the court to "unreasonably assign[ ] too little weight to a substantial mitigating circumstance." *Id.* A review of the Supreme Court of Indiana's reweighing leads to the conclusion that the court gave no weight to (c)(6) mitigating evidence that Mr. Baird lacked volitional control because of mental disease or defect. No weight is certainly "too little" under the directive of *Eddings*.

(continued...)

The Supreme Court of Indiana's reweighing presents a second concern. In reference to Mr. Baird's obsession in purchasing the farm, the court determined: "[A]s he finally realized that his grandiose plans would be exposed as a mere fantasy to the persons whose derision would be most destructive to him he was compelled to protect himself from them." *Baird*, 604 N.E.2d at 1182. There is no basis in the record for a factual determination that Mr. Baird "realized" the delusional nature of his fantasy would be exposed or that he consciously acted to "protect himself."[4] The evidence cited by the State as providing a record basis for this proposition does not establish any conscious awareness by Mr. Baird at the time of the killings that his belief in the impending receipt of one million dollars was delusional. Indeed, one

---

[3]  (...continued)

Thus, counsel sufficiently oriented this court to the issue of whether the Indiana Supreme Court improperly failed to give mitigating weight to evidence that Mr. Baird lacked volitional control because of mental illness.

[4]  The court's characterization of the evidence apparently was drawn from the trial court's comments at sentencing:

> I believe that the—that the murders were triggered by his deep seated sense of concern about being found out to be living in a fantasy world, which he knew and that the people who would harm him the most by finding out about it were—was his wife and his parents and that he could stand almost anything else but being found out by them to protect himself from them, and I believe it was, based on the evidence, that it was done in a fairly cold and calculating sort of way.

St. Ct. Rec., Vol. 10 at 10. The trial court's belief as to Mr. Baird's conscious awareness of "living in a fantasy world" similarly has no factual support in the record. Furthermore, that suggestion contradicts the trial court's own conclusion that the murders "may not have been entirely conscious." *Id.*

expert testified that Mr. Baird likely remained under the delusion at the time of trial.

The level of deference given state court factual findings on habeas review is exceptionally high. *See Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997) (describing AEDPA as creating a "highly deferential standard for evaluating state-court rulings"). Indeed, under AEDPA, a state court's factual finding is subject to a presumption of correctness. 28 U.S.C. § 2254(e)(1). The petitioner bears the burden of rebutting that presumption by clear and convincing evidence. *Id.* However, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Rather, under AEDPA standards, a federal court can disagree with a state court's factual determination and "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Id.*

Mr. Baird has met his burden here. There is scant evidence in the record that Mr. Baird ever consciously realized the delusional nature of his plans. Indeed, the sum of the evidence on this point is recounted by the majority on page 14 of its opinion. This evidence was that, when questioned by one psychiatrist, Mr. Baird agreed that the "feared exposure of his fantasy" would be a rational theory as to his motive for the murders, "but that it was not his actual motive." Slip op. at 14. Another psychiatrist thought this "*hypothesis* an 'excellent' one." *Id.* (emphasis added). I simply cannot accept, as my colleagues do, that the denial by Mr. Baird and the characterization of a hypothesis, without more, support the state court's conclusion that Mr. Baird "finally realized

that his grandiose plans would be exposed as mere fantasy."[5] Instead, this dearth of evidence, I believe, suggests that the state court's conclusion is incorrect by clear and convincing evidence. There is simply no evidence in the record that supports such a "hypothesis." It is pure surmise, and a man should not be sent to his death on such a groundless hypothetical. Moreover, the erroneous factual premise appears to have borne heavily on the reweighing process. Immediately following the erroneous factual determination, the Supreme Court of Indiana determined that Mr. Baird's mental disturbance was entitled only to low mitigating weight. The structural interrelation between the erroneous factual

---

[5] The majority opinion interprets this conclusion of the Supreme Court of Indiana as "evidence not that Baird was sane but that he was acting under compulsion." Slip op. at 15. This characterization parses too thinly, and therefore inaccurately, the conclusion of the state supreme court. That court concluded that Mr. Baird was "compelled" to murder his parents, not because he still was operating under his delusion but because "he finally *realized* that his grandiose plans would be exposed as a mere fantasy," *Baird*, 604 N.E.2d at 1182 (emphasis added); that is, Mr. Baird's newfound lucidity with respect to his "grandiose plans" motivated the crimes. The court's statement, read as a whole, suggests that the Supreme Court of Indiana did accept, at some level, the premise that Mr. Baird, at the time he killed his parents, acted in a mental state substantially different from, and substantially better than, the condition that governed his actions when he killed his wife. As I have noted earlier, that premise is not supported by the record. Moreover, as I note later in the text, the Supreme Court of Indiana compounded its erroneous assumption when it failed to realize during post-conviction review that the diagnosis of delusional disorder presented by Dr. Wooden clarified the earlier psychiatric evidence and demonstrated that Mr. Baird's delusional state was far more serious than the court had assumed in its earlier examination.

premise and the weight assigned to Mr. Baird's mental condition (as well as the apparent failure to consider evidence that Mr. Baird lacked the ability to conform his conduct to the requirements of law) give rise to a conclusion that the state court's decision was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). Thus, the erroneous factual finding not only invalidates the appellate court's reweighing under *Clemons*, but alone independently warrants habeas relief under 28 U.S.C. § 2254(d)(2).[6] The

---

[6] There is a related but independent concern that centers on the Supreme Court of Indiana's treatment of the issue of volitional capacity during its review of the post-conviction proceedings. My colleagues take the view that Mr. Baird has forfeited the argument that the Supreme Court of Indiana improperly disregarded mitigating evidence of lack of volitional control by failing to present that issue to the Supreme Court of Indiana in state post-conviction proceedings. My colleagues take the view that, although the brief mentioned the strong evidence of inability to conform conduct, Mr. Baird's complaint to the court was not that the court overlooked that evidence but that it should have given it more weight than that given to the aggravating circumstance. I cannot agree with this determination.

I believe that Mr. Baird's post-conviction brief to the Supreme Court of Indiana fairly presented the mitigating factor of his volitional impairment to the court. First, Mr. Baird specifically references this consideration in his argument headings. *See* St. Ct. Rec., Vol. 10 at 34 ("The Post-Conviction Court Erred in Finding No Evidence That Baird's Death Sentence Was Excessive, Disproportionate or Inappropriate Given the Fact That, at the Time He Committed the Charged Offenses, Baird Was Volitionally Impaired As a Result of a Serious Mental Illness to the Extent That He Could Not Conform His Actions to the Law . . . ."). He also argues that the facts "strongly suggest[ ] Baird's inability to conform his actions to the law as a result of a mental disease or

(continued...)

most accurate characterization of Mr. Baird's post-conviction argument is that the diagnosis of the nature of his mental disorder was unclear at the time of trial and that Dr. Wooden's diagnosis of delusional disorder during the evidentiary hearing in the post-conviction proceedings constituted new evidence that warranted resentencing or retrial.

When all is said and done, the Supreme Court of Indiana never came to grips with the reality that there was substantial evidence that Mr. Baird suffered from a substantially more significant impairment than an obsessive compulsive disorder. He was delusional and was thinking and acting in a distorted world of his own. Nor did the state supreme court ever critically evaluate the issue of whether Mr. Baird ever came out of his private world and made a rational and voluntary decision to murder his parents. If it had, it would have concluded that the record was devoid of any factual basis for such a determination.

When a state appellate court independently makes the individualized sentencing determination by reweighing the aggravating and mitigating evidence, *Clemons* requires a "*careful* appellate weighing" consistent with constitutional

---

[6] (...continued)

defect is a mitigating circumstance *and* one which is entitled to substantial weight." *Id.* at 59 (emphasis added). Finally, Mr. Baird cites the fact that "all of the mental health experts admit of the possibility that Baird was unable to conform his conduct to the law at the time of the commission of the charged offenses as a result of [his] mental illness" in support of reweighing the aggravating and mitigating factors. *See id.* at 63. These statements were more than sufficient to apprise the Supreme Court of Indiana of Mr. Baird's contention that the mitigating factor of lack of volitional control was at play and that it should have been weighed in the sentencing analysis.

requirements. *Clemons*, 494 U.S. at 748-49. Indeed, in *Clemons* itself, the Court remanded for further proceedings because it was unclear as to whether the Supreme Court of Mississippi reliably performed the reweighing or "fully heeded [Supreme Court] cases emphasizing the importance of the sentencer's consideration of a defendant's mitigating evidence." *Id.* at 752. In this case, the Supreme Court of Indiana appears to have excluded relevant mitigating evidence and to have relied upon a factually erroneous determination. Consequently, a careful appellate reweighing consistent with constitutional requirements has not taken place. For this reason, habeas relief is warranted, and I must respectfully dissent from the judgment of the court.

A true Copy:

     Teste:

                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*